No. 17-56665

# In the
# United States Court of Appeals
# for the Ninth Circuit

DISNEY ENTERPRISES, INC.; LUCASFILM LTD., LLC; TWENTIETH CENTURY FOX FILM CORPORATION; WARNER BROS. ENTERTAINMENT, INC.,

*Plaintiffs-counter-defendants—Appellees*,

v.

VIDANGEL, INC.,

*Defendant-counter-claimant—Appellant.*

On Appeal from the United States District Court for the
Central District of California

## OPENING BRIEF FOR APPELLANT VIDANGEL, INC.

David W. Quinto
VIDANGEL, INC.
3007 Franklin Canyon Drive
Beverly Hills, CA  90210
*dquinto@vidangel.com*

Ryan Geoffrey Baker
Jaime Wayne Marquart
Scott M. Malzahn
BAKER MARQUART LLP
2029 Century Park East, 16th Floor
Los Angeles, CA  90067
*rbaker@bakermarquart.com*

Peter K. Stris
Douglas D. Geyser
Catherine Hegdale
STRIS & MAHER LLP
725 S. Figueroa Street, Suite 1830
Los Angeles, CA  90017
Tel.:  (213) 995-6806
Fax:  (210) 978-5430
*douglas.geyser@strismaher.com*

*Counsel for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Counter-claimant—Appellant VidAngel, Inc., hereby files its corporate disclosure statement as follows. VidAngel, Inc. is a privately held corporation. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Dated: February 12, 2018

Respectfully submitted,

/s/ Douglas D. Geyser
Douglas D. Geyser
STRIS & MAHER LLP
725 S. Figueroa St., Ste. 1830
Los Angeles, CA  90017
Tel.:  (213) 995-6806
Fax:  (210) 978-5430
*douglas.geyser@strismaher.com*

i

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...........................................................................iv

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ...................................................................4

STATEMENT OF THE ISSUES......................................................................4

STATEMENT OF THE CASE .........................................................................5

SUMMARY OF ARGUMENT .......................................................................17

STANDARD OF REVIEW ...........................................................................20

ARGUMENT .............................................................................................20

I.  VidAngel Stated A Horizontal Restraint Of Trade By Plausibly
    Alleging An Agreement Among The Studios To Boycott Secondary
    Filtering Companies........................................................................20

    A.  Rule 8 And *Twombly* Require Only A Plausible Allegation Of
        Collusion, And The Court Cannot Choose Between Competing
        Inferences From The Plaintiff And Defendant...................................22

    B.  The DGA Agreement Constitutes An Express Agreement To
        Boycott Secondary Filtering Companies ...........................................26

    C.  Apart From The DGA Agreement, VidAngel Plausibly Alleged
        Collusion Through Parallel Conduct And Plus Factors.....................31

        1.  VidAngel plausibly alleged parallel conduct in a context
            that suggests agreement ..........................................................31

        2.  The district court misunderstood the controlling legal
            standard and impermissibly chose between competing
            inferences from the complaint .................................................41

II.     VidAngel Stated A Vertical Restraint Of Trade By Plausibly Alleging Market Power...................................................................................50

III.    VidAngel Plausibly Alleged A Violation Of California's Unfair Competition Law ....................................................................................55

IV.     VidAngel Stated a Claim For Intentional Interference With Prospective Economic Relations ...................................................................58

V.      At The Very Least, VidAngel Should Have Been Granted Leave To Amend...................................................................................................59

CONCLUSION ..............................................................................................60

STATEMENT OF RELATED CASES ...................................................................60

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Ad Mgmt., Inc. v. GTE Corp.*,
92 F.3d 781 (9th Cir. 1996) ...................................................................20

*Anderson News, LLC v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ............................................................ *passim*

*Ariz. Students' Ass'n v. Ariz Bd. of Regents*,
824 F.3d 858 (9th Cir. 2016) ................................................................60

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................... 4, 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................. *passim*

*California ex rel. Harris v. Safeway, Inc.*,
651 F.3d 1118 (9th Cir. 2011) ..............................................................21

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) ................................................................57

*City of San Jose v. Office of Comm'r of Baseball*,
776 F.3d 686 (9th Cir. 2015) ................................................................57

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
479 F.3d 1099 (9th Cir. 2007) ..............................................................58

*Davis v. HSBC Bank Nev., NA*,
691 F.3d 1152 (9th Cir. 2012) ..............................................................56

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ...................................................... 6, 13, 57

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
504 U.S. 451 (1992)................................................................. 51, 54

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ..............................................................59

iv

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Evergreen Partnering Grp. v. Pactiv Corp.*,
 720 F.3d 33 (1st Cir. 2013) ........................................................ *passim*

*Gelboim v. Bank of Am. Corp.*,
 823 F.3d 759 (2d Cir. 2016) ................................................... 33, 43

*Gregg v. Haw. Dep't of Pub. Safety*,
 870 F.3d 883 (9th Cir. 2017) ...................................................... 20

*In re Musical Instruments & Equipment Antitrust Litig.*,
 798 F.3d 1186 (9th Cir. 2015) ................................................ 23, 32

*In re Text Messaging Antitrust Litig.*,
 630 F.3d 622 (7th Cir. 2010) ..................................... 23, 32, 33, 50

*Interstate Circuit v. United States*,
 306 U.S. 208 (1939) ................................................................ *passim*

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
 466 U.S. 2 (1984) ....................................................................... 54

*Kendall v. Visa U.S.A., Inc.*,
 518 F.3d 1042 (9th Cir. 2008) ....................................... 44, 45, 49, 50

*Korea Supply Co. v. Lockheed Martin Corp.*,
 29 Cal. 4th 1134 (2003) ............................................................ 58

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
 551 U.S. 877 (2007) .................................................................. 40

*Lozano v. AT&T Wireless Servs., Inc.*,
 504 F.3d 718 (9th Cir. 2007) ................................................. 55, 56

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
 465 U.S. 752 (1984) .............................................................. 22, 29

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
 468 U.S. 85 (1984) .................................................................... 21

*Newcal Indus., Inc. v. Ikon Office Solutions*,
 513 F.3d 1038 (9th Cir. 2008) ....................................... 3, 51, 52, 53

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Osborn v. Visa Inc.*,
  797 F.3d 1057 (D.C. Cir. 2015)....................................................................33

*Petersen v. Boeing Co.*,
  715 F.3d 276 (9th Cir. 2013) .......................................................................59

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indemnity Co.*,
  870 F.3d 1262 (11th Cir. 2017) ............................................................. 23, 46

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .......................................................... 3, 21, 51, 53

*Redbox Automated Retail LLC v. Universal City Studios LLP*,
  No. 08-766(RBK), 2009 WL 2588748 (D. Del. Aug. 17, 2009).........................51

*Redbox Automated Retail, LLC v. Buena Vista Home Entm't, Inc.*,
  No. 2:18-cv-677 (C.D. Cal. Jan. 26, 2018)...........................................................8

*Robertson v. Sea Pines Real Estate Cos.*,
  679 F.3d 278 (4th Cir. 2012) ................................................................ 24, 31, 49

*Roybal v. Equifax*,
  No. 2:05-cv-01207-MCE-KJM,
  2008 WL 4532447 (E.D. Cal. Oct. 9, 2008).......................................................59

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015) ...................................................................... *passim*

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) .........................................................................24

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ........................................................... 25, 32, 44, 49

*Syufy Enters. v. Am. Multicinema, Inc.*,
  793 F.2d 990 (9th Cir. 1986) .........................................................................53

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................................44

vi

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
346 U.S. 537 (1954)..................................................................22

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) ....................................... *passim*

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ....................................................40

*United States v. Colgate & Co.*,
250 U.S. 300 (1919)..................................................................57

*United States v. Corinthian Colls.*,
655 F.3d 984 (9th Cir. 2011) ...................................................24

*United States v. Visa U.S.A., Inc.*,
344 F.3d 229 (2d Cir. 2003) ................................... 52, 53, 54

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
648 F.3d 452 (6th Cir. 2011) ................................... 25, 42, 47

*White v. R.M. Packer Co.*,
635 F.3d 571 (1st Cir. 2011)....................................................22

*Whittlestone, Inc. v. Handi-Craft Co.*,
618 F.3d 970 (9th Cir. 2010) ................................... 29, 31

**Statutes**

15 U.S.C. § 1 ..............................................................................20

15 U.S.C. § 15 ..............................................................................4

15 U.S.C. § 26 ..............................................................................4

28 U.S.C. § 1291 ..........................................................................4

28 U.S.C. § 1331 ..........................................................................4

28 U.S.C. § 1337 ..........................................................................4

28 U.S.C. § 1367 ..........................................................................4

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ......................................................... 14, 55

**Other Authorities**

Ben Fritz, *Disney Deal for Fox Would End Era of the 'Big Six' Studios*,
Wall Street Journal (Dec. 11, 2017)................................................. 7, 33

Brooks Barnes, *Disney Makes $52.4 Billion Deal for 21st Century Fox in
Big Bet on Streaming*, N.Y. Times (Dec. 14, 2017) ...............................55

Brooks Barnes, *Movie Studios See a Threat in Growth of Redbox*, N.Y.
Times (Sept. 6, 2009).................................................................8

Dan Ackman, *Movie Studios Get Hip with the Future*, Forbes
(Aug. 17, 2001).......................................................................8

Director's Guild of America, *2014 Basic Agreement*...................................27

Director's Guild of America, *Summary of Directors' Creative Rights
Under the Directors Guild of America Basic Agreement of 2014* § D(5) ..........28

H.R. Rep. No. 109-33, pt. 1, 109th Cong., 1st Sess. (2005).......................6

*Home Recording of Copyrighted Works: Hearing on H.R. 4783, H.R.
4794, H.R. 4808, H.R. 5250, H.R. 5488, and H.R. 5705 Before the
Subcomm. on Courts, Civil Liberties, and the Admin. of Justice of the
H. Comm. on the Judiciary*, 97th Cong. (1982).......................................8

Peter M. Nichols, *Home Video*, N.Y. Times (July 12, 1996) .....................8

**Rules**

Fed. R. App. P. 4(a)(1)(A) ............................................................4

Fed. R. Civ. P. 8(a)(2)................................................... *passim*

Fed. R. Civ. P. 12(b)(6)................................................ 25, 53

Fed. R. Civ. P. 54(b) ................................................... 4, 17

Fed. R. Civ. P. 56 ......................................................... 43

**INTRODUCTION**

VidAngel provides a technology demanded by millions of Americans: the ability to remove (*i.e.*, "filter") objectionable material from movies and television shows streamed online. To provide that service, VidAngel and other such filtering companies first need to gain access to those movies and shows. But Hollywood studios have impeded those efforts. They have agreed among themselves to refuse to deal with filtering companies and have obligated their downstream content distributors to do the same. VidAngel accordingly brought antitrust claims against the appellee studios (the "Studios") alleging horizontal and vertical restraints of trade under the Sherman Act. This appeal challenges the Rule 12(b)(6) dismissal of those antitrust claims and state-law unfair-business-practices claims.

To support its complaint, VidAngel alleged a written agreement among the Studios that strictly circumscribes permissible edits with no allowance for filtering by secondary companies (*i.e.*, companies that did not create the content), as well as extensive circumstantial evidence supporting collusion, including specific instances where the Studios caused their licensees to withdraw support for VidAngel. VidAngel also explained *why* the Studios would conspire: Movie and television directors oppose filtering, but the untapped filtering market offers substantial profits; pulled between the directors' wishes and a promising sales outlet, the Studios agreed to maintain the status quo. If one studio deviated, it could disrupt the industry and allow

1

that studio to gain a first-mover advantage in the filtering market. Their agreement thus minimized the risk of diverse action and maintained the Studios' dominant market positions.

Moving to dismiss, the Studios did not deny that they refused to deal with VidAngel, nor did they dispute the demand for filtering services. Instead they urged the court to construe the written agreement as a matter of law to not prohibit filtering, and they argued that each Studio independently decided to boycott secondary filtering companies simply to avoid upsetting the directors. Accordingly, during the hearing on the motion, the district court twice remarked that the Studios' arguments felt more like a summary-judgment motion than a motion to dismiss. ER94, ER102.

The court should have trusted its instinct. Instead it interpreted contract language as a matter of law without any evidence of the parties' intent, and repeatedly accepted the Studios' proposed "legitimate business reason[s]" for their conduct. ER20. But "'[t]he question at the pleading stage is not whether there is a plausible *alternative* to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible.'" *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) (emphasis in original) (quoting *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012)).

VidAngel's complaint satisfied that obligation through its reasonable interpretation of the written agreement and detailed circumstantial evidence, including

2

the Studios' motive to conspire. When the court instead credited the Studios' proposed inferences over VidAngel's plausible ones, the court got the pleading standard exactly backwards. Indeed, "[p]ost-*Twombly* appellate courts have often been called upon to correct district courts that mistakenly engaged in this sort of premature weighing exercise in antitrust cases." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015). It is now this Court's turn to join that chorus.

The court similarly erred in dismissing VidAngel's vertical-restraint claim. It held that each Studio lacked market power as a matter of law, thinking that each must possess a minimum market share for a vertical claim to proceed. But this Court has unequivocally explained that "the existence or non-existence of that market power is a factual question," *Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1052 (9th Cir. 2008), and has therefore cautioned against "apply[ing] such bright-line rules regarding market share," *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 n.10 (9th Cir. 1995).

Ultimately, to survive the Studios' motion to dismiss, VidAngel needed to assert *plausible* claims, not *probable* ones, for "'a plaintiff may only have so much information at his disposal at the outset.'" *SD3*, 801 F.3d at 425 (citation omitted). VidAngel readily met that standard. The district court's premature dismissal should be reversed.

3

## JURISDICTIONAL STATEMENT

1. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. §§ 15 and 26. The court expressly certified its decision as a final judgment under Fed. R. Civ. P. 54(b), and this Court now has jurisdiction under 28 U.S.C. § 1291.

2. The notice of appeal was timely filed on November 2, 2017, after entry of the district court's judgment on October 31, 2017. Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

To survive a motion to dismiss, a plaintiff is entitled to all inferences in its favor and must state only a plausible, not a probable, claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Despite VidAngel's detailed allegations, the district court dismissed VidAngel's claims under the Sherman Act, California's Unfair Competition Law ("UCL"), and the tort of intentional interference with prospective economic relations.

The questions presented are:

1. Whether VidAngel plausibly alleged an agreement among the Studios to boycott secondary filtering companies, where VidAngel described (a) a written agreement that generally prohibits all edits to motion pictures without the director's involvement and (b) parallel conduct and multiple "plus factors" suggesting collusion.

2. Whether VidAngel plausibly alleged market power in support of its vertical antitrust claim, where this Court has described market power as a factual question and VidAngel alleged that each Studio used its leverage to

force its licensees to accept anti-filtering restrictions against the licensees' interests.

3.  Whether VidAngel adequately pleaded a claim under California's UCL, either based on its federal antitrust claims or because the harm to consumers from the Studios' conduct outweighed its utility.

4.  Whether VidAngel adequately pleaded a claim for intentional interference with prospective economic relations, where VidAngel had an expectation of probable economic benefit from content distributors YouTube and Google Play before the Studios disrupted those relationships.

5.  Whether, if the district court properly dismissed VidAngel's claims, it erred in dismissing them with prejudice, where VidAngel requested leave to amend and could supply additional factual detail to support its claims.

## STATEMENT OF THE CASE

1. a. VidAngel provides a streaming video service that allows customers to filter violent, obscene, and other objectionable content from movies and television shows. ER264. It was founded by brothers raised in a home that did not watch entertainment with nudity or excessive profanity or violence. They could not watch these pictures at all, as there was no effective way to remove that content. As adults, the brothers developed VidAngel's technology so their own children and others with similar sensibilities would not face such a binary choice. ER185-188. Filtering allows individuals to share in entertainment that forms a large part of American culture while upholding their personal or religious convictions.

VidAngel's founders' preferences are commonplace. The National Research Group pegs the market for filtered movies at 56 million people, and a survey conducted for VidAngel estimated that 47% of parents want online filtering services. ER266, 274. Over half of VidAngel's customers would not have even watched the movie they selected absent filtering. ER200-201, 286. It is thus no surprise that a representative from Google, hardly an unsophisticated entity, engaged in significant partnering discussions with VidAngel (before encountering obstacles from the Studios). Indeed, although filtering via streaming is a relatively novel technology, the desire to watch pictures without objectionable content is nothing new—broadcast television must satisfy certain content standards, and some in-flight movies are edited similarly. *E.g.*, ER271.

Congress, too, has recognized the demand for filtering. The Family Movie Act of 2005 ("FMA") "was designed to allow consumers to skip objectionable audio and video content in motion pictures without committing copyright infringement." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 857 (9th Cir. 2017). The FMA protects individual preferences regarding what is offensive, "whether or not the skipped content is viewed as objectionable by most, many, few, or even one viewer." H.R. Rep. No. 109-33, pt. 1, 109th Cong., 1st Sess. 6 (2005). And "[t]he for-profit nature of the" filtering company does not affect the act's operation. *Ibid.* Notably,

the FMA was a response to a studio lawsuit against a different filtering company (in which additional filtering companies were involved). *Infra* at 12.

The Studios have never licensed content to any secondary filtering company.

b. The Studios comprise half the "Big Six" "movie studios that have dominated the industry for decades."[1] Ben Fritz, *Disney Deal for Fox Would End Era of the 'Big Six' Studios*, Wall Street Journal (Dec. 11, 2017).[2] They have substantial power in the markets for high-grossing movie productions and high-rated television shows. ER287-288. In the overall motion-picture industry, Disney enjoys a market share of 26.2%, while Warner Bros. has 16.5% and Fox 14.1%. ER288. Warner Bros. is also the largest television-production company. ER288-289. The Studios' product is critical to a filtering company's viability. Without the movies and shows consumers want to watch, that company will fail.

The Studios' longstanding dominant positions have made them appreciate the industry's status quo, and accordingly they have resisted innovations that might shift market dynamics. For instance, the advent of VCRs so troubled the Studios and the rest of the Motion Picture Association of America ("MPAA") that the MPAA head

---

[1] Lucasfilm is a Disney subsidiary. ER264.

[2] https://www.wsj.com/articles/disney-deal-for-fox-would-end-era-of-the-big-six-studios-1512907201.

told Congress "the VCR is to the American film producer and the American public as the Boston strangler is to the woman home alone."[3] As it turned out, home video proved hugely profitable for the studios.[4] Similarly, some studios initially refused to deal with Redbox (the low-cost rental service) due to fears of how Redbox might disrupt the market, but, aside from Disney, the major studios eventually realized that partnering with Redbox increased sales and exposure for their products.[5]

c. Despite the undisputed demand for filtering services, the Studios have agreed among themselves to resist partnering with secondary filtering companies or even allowing their licensees to deal with filterers. That agreement has manifested itself in several ways.

The Studios have expressly agreed to prevent *any* editing of a motion picture except in limited circumstances that require the director's involvement, none of

---

[3] *Home Recording of Copyrighted Works: Hearing on H.R. 4783, H.R. 4794, H.R. 4808, H.R. 5250, H.R. 5488, and H.R. 5705 Before the Subcomm. on Courts, Civil Liberties, and the Admin. of Justice of the H. Comm. on the Judiciary*, 97th Cong. 8 (1982) (statement of Jack Valenti).

[4] Dan Ackman, *Movie Studios Get Hip with the Future*, Forbes (Aug. 17, 2001), www.forbes.com/2001/08/17/0817topnews.html; Peter M. Nichols, *Home Video*, N.Y. Times (July 12, 1996), www.nytimes.com/1996/07/12/movies/home-video-078344.html.

[5] *See* Compl. [Doc. 1] ¶¶ 2, 26-27, *Redbox Automated Retail, LLC v. Buena Vista Home Entm't, Inc.*, No. 2:18-cv-677 (C.D. Cal. Jan. 26, 2018); Brooks Barnes, *Movie Studios See a Threat in Growth of Redbox*, N.Y. Times (Sept. 6, 2009), http://www.nytimes.com/2009/09/07/business/media/07redbox.html.

which embrace filtering. The Studios (among other content owners, including all other MPAA studios) executed an agreement with the Directors Guild of America that extensively governs the interaction between directors and studios (the "DGA Agreement"). ER150-156. Article 7 of the DGA Agreement covers post-production of motion pictures. ER151. It begins by providing that the director's "participation" is "require[d]" "in all creative phases of the film-making process, including but not limited to all creative aspects of sound and picture." *Ibid.* In turn, Section 7-509 carefully circumscribes the editing process. ER152-156. Recognizing that some alterations are necessary to cash in on lucrative viewing markets, Section 7-509 allows certain edits but makes them contingent on the director's involvement. For instance, if a picture needs editing to meet Network Broadcast Standards and Practices or for in-flight viewing, the director is entitled to make those edits. ER153, 155 (§ 7-509(b), (g)). The same paragraph that addresses in-flight editing also mentions streaming services (called "New Media" by the DGA Agreement). If a studio licenses a picture for exhibition "domestically in New Media," and the studio "edits such motion picture at its own facilities in the United States," then the director is entitled to edit the picture. ER155 (§ 7-509(g)). The DGA Agreement does not contain an allowance for editing by secondary filtering companies.

The Studios' efforts to suppress filtering companies reflect that agreement. VidAngel described multiple instances where the Studios themselves have refused

9

to deal with filterers or prevented their licensees from doing so. In July 2015, VidAngel wrote each Studio individually to introduce its streaming service and express its desire "to work with" and "partner with" content providers, noting its belief that a partnership could expand the Studio's "market reach." ER308; *see* ER284. None of the Studios responded, but VidAngel tried again the next month. ER284; *see* ER318-320.[6] These efforts proved futile. Although Fox and Time Warner (Warner Bros.' parent) arranged meetings or calls, Fox failed to appear as scheduled, and Time Warner cancelled without rescheduling. ER284-285. Disney never responded at all. Each Studio instead contacted the MPAA and each other to discuss VidAngel. In August 2015 alone, the Studios' employees exchanged 124 messages about VidAngel with other studios and among themselves. *Ibid.*

Nearly a year later, the Studios sued VidAngel for violations of the Copyright Act. *Infra* at 13. Trying to avoid litigation and still seeking a mutually beneficial bargain, VidAngel proposed a streaming licensing arrangement. ER180. Again the Studios declined to discuss.

In the meantime, VidAngel contacted other studios to discuss licensing. One of these, Lionsgate Entertainment, told VidAngel the Directors Guild would need to

---

[6] These letters were addressed to the Studios' attorneys because VidAngel also inquired about "adequately protect[ing] the rights of copyright owners" (ER310) and wanted to avoid any ethical implications from contacting non-lawyers when it knew the Studios had counsel.

approve any such agreement. ER270. No discussion with any studio who signed the DGA Agreement progressed meaningfully.

The Studios have also ensured that filtering companies cannot sidestep them by partnering with their licensees. In November 2014, a representative from Google Play—a division of Google that sells and rents movies and television shows under licenses with content owners—approached VidAngel to discuss a partnership that would integrate VidAngel's filtering technology into Google Play's distribution platform. ER278. The Google Play representative, Mark Fleming, told VidAngel's CEO that Google Play was interested but would have to check whether Google's contracts with the Studios would block the partnership. On this front, he specifically noted the Studios' contract with the directors. ER17, 397.

The Studios would in fact prevent the deal. Negotiations between VidAngel and Google Play continued fruitfully for several months until March 2015 when, after meeting with Sony representatives, Fleming told VidAngel's CEO that at least one of the MPAA studios would refuse to allow Google to partner with VidAngel. ER279.

Before this incident, VidAngel confronted similar barriers at other Google divisions. In 2013 VidAngel had developed a filtering system that worked with Google's Chromecast device, a piece of hardware that allows high-definition televisions to stream HD content. VidAngel accordingly contacted Google to inquire

11

about buying the devices wholesale so VidAngel could sell them to consumers who wanted filtering. ER276-277. Google responded that VidAngel first needed to successfully launch a public test of its Chromecast filtering technology. But once VidAngel launched in February 2014, it discovered that Google had in the meantime made a technological change that disabled VidAngel's filtering. ER277.

Similarly, VidAngel initially provided a service that allowed users to filter videos played on YouTube (which Google owns). That filtering capability also was terminated due to the Studios' pressure. In December 2013, YouTube told VidAngel that by modifying content, its filtering violated YouTube's terms of use—the very anti-editing term the Studios induced YouTube to include. ER277.

And VidAngel is not the only filtering company that the Studios have impeded. In the early 2000s, a company called ClearPlay developed a special DVD player that enabled filtering. ER138, 280. ClearPlay tried to negotiate a license with the studios but made no progress; instead the studios sued. ER138. That litigation is what prompted Congress to enact the FMA, and the lawsuit failed only after the FMA approved filtering. ER138-139. Yet the Studios still have not granted a license to ClearPlay, whose filtering mechanism remains expensive for consumers and often fails to function. ER139, 280.

Accordingly, as a result of the Studios' conduct—and despite Congress's efforts—the filtering industry has been unable to get off the ground. ER269. VidAngel

12

in particular has suffered. It has been denied access to distribution outlets like Google Play and YouTube, and it has been forced to find inefficient ways to provide streaming filtering to the millions who demand it. *E.g.*, ER292.

2. Due to the Studios' boycott, VidAngel developed a technology that obviated the need to obtain content directly from the Studios but would (or so VidAngel believed) comply with the copyright laws: a customer purchased a DVD or Blu-ray disc from VidAngel, who retained possession of the disc and used a master copy to stream a filtered version of the work edited to remove the content the customer found objectionable. *See Disney*, 869 F.3d at 853-854. After watching the work, the customer would sell the disc back to VidAngel. *Id.* at 854. This is the model VidAngel described in its July/August 2015 letters that the Studios effectively ignored.

In June 2016, the Studios sued VidAngel for violations of the Copyright Act. *Id.* at 855. The district court entered a preliminary injunction, which this Court affirmed. *Id.* at 852. VidAngel subsequently filed for bankruptcy, leading the district court to stay prosecution of the copyright claims. ER70.

Despite these setbacks, VidAngel has continued to pursue its mission to provide filtering services. It has struggled, however, to develop technology that can function without the Studios' express permission. VidAngel is currently operating using technology that it believes satisfies all the Studios' copyright concerns. Unfortunately, that mechanism has limitations and suffers technical difficulties that

13

have disappointed VidAngel's customers who want to watch family-friendly content. While that technology is not the subject of the pending litigation, it shows VidAngel's commitment to bona fide filtering.

3. a. As part of the copyright litigation, VidAngel counterclaimed for violations of the Sherman Act, intentional interference with prospective economic advantage, and violations of California's UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq.* ER264-304.[7] VidAngel asserted these claims against the Studios and unnamed Does who committed the same misconduct. VidAngel seeks damages, as well as an injunction under the UCL.

VidAngel's antitrust counterclaims allege that the Studios have entered into horizontal and vertical agreements in restraint of trade: the appellee Studios and other studios agreed among themselves to boycott secondary filtering companies, and each Studio used its market power to induce its downstream licensees to refuse to cooperate with VidAngel. As to the horizontal agreement, VidAngel relied on direct and circumstantial evidence of concerted action. VidAngel alleged that the DGA Agreement alone represented an agreement to ban secondary filtering. Even without that express agreement, however, the Studios engaged in parallel conduct in a context that indicated collusion. The Studios uniformly and consistently refused to

---

[7] VidAngel amended its countercomplaint once after the Studios initially moved to dismiss.

14

deal with VidAngel and other filtering companies, and even induced their down-stream licensees to boycott similarly. But given the demand for filtering services, the Studios had financial incentives to work with VidAngel. Absent a group boycott, at least one Studio would have tried to exploit the filtering market. The reason for the agreement—in the face of that profit motive—was that any Studio that deviated from that agreement would upset the status quo and gain a first-mover advantage with filtering companies and customers.

Regarding the vertical restraint of trade, VidAngel alleges that the Studios used their market power to insert terms into licensing agreements with content dis-tributors that prohibited those distributors from dealing with secondary filtering companies even though those distributors would otherwise want to exploit the filter-ing market.

The UCL claim alleges that the Studios' conduct was both "unlawful" (be-cause it violated the Sherman Act) and "unfair" (because it injures consumers) and accordingly seeks an injunction. The tort claim argues that the Studios' interference with VidAngel's business relations, particularly with YouTube and Google Play, unlawfully thwarted those reasonably probable economic benefits.

b. The Studios moved to dismiss, and the district court granted the motion. ER28.[8] Beginning with the horizontal conspiracy, the court held that VidAngel did not plausibly allege collusion among the Studios. The court viewed the DGA Agreement as "clear and unambiguous" in not prohibiting filtering. ER15. The court also adopted the Studios' alternative explanation for their conduct: each Studio independently decided to prohibit filtering because the directors dislike filtering. The court held that this plausible alternative rendered VidAngel's claim implausible. Similar logic pervaded the rest of the court's discussion. According to the court, the directors' distaste for filtering explained all the Studios' hostile acts toward filterers. The court expressly rejected VidAngel's contention that "the Court cannot choose between competing inferences at this stage of the proceedings." ER16.

Turning to the vertical conspiracy, the court held that, because VidAngel's allegations of collusion failed, the Studios' individual market shares could not be aggregated. And the court wrote that each Studio lacked market power on its own because as a matter of law there exists a minimum market share below which a party cannot have market power sufficient to violate the Sherman Act. ER22-23.

---

[8] The court accepted the Studios' request for judicial notice of multiple documents mentioned in VidAngel's complaint: excerpts from the DGA Agreement; an email exchange between Fleming and VidAngel's CEO; an email exchange between attorneys for VidAngel and the Studios; and a declaration of VidAngel's CEO from the preliminary-injunction litigation. ER12-13.

The court quickly dismissed VidAngel's tort and UCL claims. As to the former, the court chiefly reasoned that VidAngel's business relationships were too speculative. ER23-24. As to the latter, the court ruled that the UCL claim failed because it was predicated on VidAngel's Sherman Act claims. ER25.

Finally, without elaboration, the court denied VidAngel leave to amend "[b]ecause VidAngel has previously amended its countercomplaint, and there is no indication in the record or the pleadings that VidAngel can identify additional facts to support its claims." ER28.[9]

4. VidAngel moved for a partial final judgment under Fed. R. Civ. P. 54(b), which the court granted. ER2. This appeal followed.

## SUMMARY OF ARGUMENT

I. The court erroneously dismissed VidAngel's horizontal-conspiracy claim for failing to plausibly allege concerted action to boycott secondary filtering companies. A viable horizontal claim can rest on direct evidence (*e.g.*, an express, written document) or circumstantial evidence in the form of parallel conduct and "plus factors," *i.e.*, facts that place the parallel conduct in a setting that suggests collusion. At this stage, VidAngel need allege only enough facts to *suggest* agreement. It is not

---

[9] The court also struck VidAngel's copyright misuse defense, holding that the Studios' licensing agreements did not "control an area outside of [their] copyrighted works." ER27.

necessary to exclude an inference of independent action, and the plausibility of an innocent justification for the defendants' actions does not warrant dismissal.

VidAngel used both direct and circumstantial evidence. First, the DGA Agreement restricts the editing process with only certain exceptions—and none of those exceptions covers filtering. The court impermissibly interpreted that language to adopt the Studios' preferred reading on a motion to dismiss.

Second, VidAngel plausibly alleged parallel conduct with multiple plus factors: a concentrated industry structure, facilitating practices like exchanging emails and coordinating action through MPAA membership, the Studios' refusal to exploit the profitable filtering market, the insertion of anti-filtering terms in downstream licensees' contracts, and a plausible explanation for why the Studios agreed to snub that market—to avoid disrupting the status quo they dominate, exhibiting a risk aversion similar to their hostility to the VCR and Redbox. The court's rejection of this detailed circumstantial evidence rested nearly entirely on its belief that the directors' opposition to filtering plausibly explained why each Studio might independently rebuff filtering companies. But multiple circuits, including this one, have unambiguously stated that courts cannot weigh competing inferences at the pleadings stage.

II. The court also mistakenly applied too harsh a standard to VidAngel's vertical-restraint claim. The court held that each Studio's market share as a matter of law precludes market power. The court cited no case law to support that holding,

18

and indeed this Court has indicated precisely the opposite: market power is a factual question. VidAngel's complaint readily alleges market power by describing (1) how the Studios have forced their licensees to refuse to deal with filterers and (2) a market for high-grossing movies and high-rated television shows where each Studio dominates.

III. California's UCL separately prohibits "unlawful" conduct *and* "unfair" conduct. Accordingly, VidAngel's UCL claim should be reinstated for two reasons. First, its "unlawful" claim rests on its Sherman Act claims, so because those claims survive, this claim does, too. Second, the UCL independently proscribes "unfair" conduct, *i.e.*, conduct whose harm outweighs its utility. Boycotting secondary filtering companies makes quality filtering services difficult (or impossible) to obtain, and the benefits of that conduct are negligible at best. Indeed, there is no good reason whatsoever to forbid Google to work with filterers. Even if the Court imposes a bright-line rule regarding market share under the Sherman Act, no such threshold could justify dismissing VidAngel's "unfair" UCL claim.

IV. A claim for intentional interference with prospective economic advantage requires, among other elements, conduct (1) that is wrongful independent of the interference and (2) that interferes with a reasonably probable economic benefit. VidAngel's antitrust and UCL claims satisfy the first element, and its relationships with YouTube and Google Play satisfy the second—VidAngel was actively reaping

19

benefits from YouTube when the Studios interfered, and the Google Play negotiations had steadily progressed until the Studios' pressure ended them.

V. Even if the court properly dismissed VidAngel's claims, denying leave to amend was plainly incorrect. Leave should be granted extremely liberally, and the court did not even attempt to explain why it thought VidAngel unable to save its complaint. It is incoherent to dismiss claims for purportedly lacking sufficient detail, then refuse the opportunity to supply those very details.

## STANDARD OF REVIEW

This Court reviews de novo the grant of a motion to dismiss. It reviews the denial of leave to amend for an abuse of discretion, but reviews an underlying determination of futility de novo. *Gregg v. Haw. Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017).

## ARGUMENT

**I. VIDANGEL STATED A HORIZONTAL RESTRAINT OF TRADE BY PLAUSIBLY ALLEGING AN AGREEMENT AMONG THE STUDIOS TO BOYCOTT SECONDARY FILTERING COMPANIES**

Section 1 of the Sherman Act (15 U.S.C. § 1) requires "three elements: (1) an agreement, conspiracy, or combination between two or more entities; (2) an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996). The district court's judgment rested exclusively on the first

20

element, holding that VidAngel did not adequately allege that the Studios "were party to a horizontal conspiracy to prohibit filtering." ER21. The court erred.

The Sherman Act recognizes that "[c]onsumer welfare is maximized when economic resources are allocated to their best use," thereby assuring "competitive price and quality." *Rebel Oil*, 51 F.3d at 1433. "A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107 (1984). "The touchstone" of the Act, therefore, "is consumer good." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1132 (9th Cir. 2011). "Agreements of competitors, whether express or implicit, whether by formal agreement or otherwise, in restraint of trade are outlawed." *Ibid.*

The Studios violated these principles. They agreed to deny secondary filtering companies a critical component for filtering technology. As a result, millions of consumers who want filtering services must settle for inferior options—or none at all. Because VidAngel adequately pleaded concerted action, its horizontal-conspiracy claim should be reinstated.

21

**A. Rule 8 And *Twombly* Require Only A Plausible Allegation Of Collusion, And The Court Cannot Choose Between Competing Inferences From The Plaintiff And Defendant**

A viable Section 1 claim requires concerted, rather than independent, action. *Twombly*, 550 U.S. at 553 (citation omitted); *see Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). That necessary agreement, however, can be "'tacit or express.'" *Twombly*, 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)); *see also, e.g.*, *Interstate Circuit v. United States*, 306 U.S. 208, 221, 226-227 (1939). A tacit agreement arises where "only the conspirators' actions, and not any express communications, indicate the existence of an agreement." *White v. R.M. Packer Co.*, 635 F.3d 571, 576 (1st Cir. 2011). For example, in *Interstate Circuit*, a powerful player at one level of a distribution chain asked multiple entities on another level to accede to certain demands, and each complied. The Supreme Court inferred agreement from the defendants' conduct: "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." 306 U.S. at 226.

Accordingly, a plaintiff may allege collusion through "either direct or circumstantial evidence of" agreement. *Evergreen Partnering Grp. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013) (citing *Monsanto*, 465 U.S. at 764); *see In re Musical*

*Instruments & Equipment Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015). Direct evidence includes "form (written or oral) and date of entry," *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 870 F.3d 1262, 1274 (11th Cir. 2017), or "an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy," *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).

Absent direct evidence, a plaintiff still states a claim by pleading parallel conduct plus "some further factual enhancement" (*Twombly*, 550 U.S. at 557) in the form of what this Court calls "plus factors": "enough nonconclusory facts to place that parallel conduct 'in a context that raises a suggestion of a preceding agreement,'" *Musical Instruments*, 798 F.3d at 1194 (quoting *Twombly*, 550 U.S. at 557). Parallel conduct *alone* does not suffice, because "mere parallel conduct is as consistent with agreement among competitors as it is with independent conduct in an interdependent market." *Id.* at 1193. But the complaint survives a motion to dismiss when it accompanies that parallel conduct with "enough factual matter (taken as true) to suggest that an agreement was made," such as "'parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *Twombly*, 550 U.S. at 556 & n.4 (citation omitted).

At the pleadings stage, VidAngel need not *prove* a tacit or express agreement among the Studios. *See, e.g.*, *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012). It need provide only "a short and plain statement of the claim showing that [VidAngel] is entitled to relief" (Fed. R. Civ. P. 8(a)(2)) in order "to 'give the [Studios] fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (ellipsis in original) (citation omitted). "[S]tating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. The claim, that is, must be "plausible." *Ibid.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plausibility standard "does not impose a probability requirement." *Twombly*, 550 U.S. at 556. "[I]t simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Ibid.* And the Court must draw all inferences in the plaintiff's favor. *E.g.*, *United States v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011).

Critically, a court cannot choose between competing inferences regarding the defendants' conduct. As long as the complaint raises a plausible inference of collusion, it does not matter that the defendants can proffer a plausible, innocent explanation for their conduct. *See, e.g.*, *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)

24

("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."); *SD3*, 801 F.3d at 425 (court cannot "weigh[] the competing inferences that can be drawn from the complaint"); *Evergreen*, 720 F.3d at 46 ("'[I]t is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives.'") (quoting *Anderson News*, 680 F.3d at 190); *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage."). The plausibility threshold thus "'remains considerably less than the 'tends to rule out the possibility' standard for summary judgment.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 307d1 (3d ed. 2007)); *see Twombly*, 550 U.S. at 554 (contrasting plausibility standard with standards for reviewing jury verdict and summary judgment). "Indeed," it would be "wholly unrealistic" to extend that summary-judgment standard to the pleadings stage, "as 'a plaintiff may only have so much information at his disposal at the outset.'" *SD3*, 801 F.3d at 425 (citation omitted).

VidAngel's extensive allegations satisfy *Twombly* and Rule 8. As detailed below, its complaint described *both* direct and circumstantial evidence that plausibly

25

allege the necessary agreement. Each category of allegations independently overcomes the Studios' motion to dismiss and also reinforces the other category. That is, the Studios' refusal to deal with filtering companies reflects VidAngel's interpretation of the DGA Agreement, and that interpretation likewise predicts the Studios' refusal to deal. Reversal is warranted.

**B. The DGA Agreement Constitutes An Express Agreement To Boycott Secondary Filtering Companies**

1. The DGA Agreement constitutes direct evidence of an express agreement to ban filtering. *E.g.*, ER270. Each Studio signed the DGA Agreement, knowing that the others would also sign, and VidAngel plausibly alleges that the text requires the signatories to refuse to deal with secondary filtering companies, which is precisely how the Studios have understood and implemented it. ER265-266. That reasonable interpretation suffices to allege collusion under Section 1.

The DGA Agreement operates by broadly prohibiting editing a motion picture without consulting its director. *See* ER14 (Section 7-509 "establishes an obligation for the studios to consult with directors when editing motion pictures"); ER151 (§ 7-101) (requiring the director's "participation in all creative phases of the film-making process, including but not limited to all creative aspects of sound and pic-

26

ture"); § 7-506 (giving directors the "right" "to consult with the Employer through-out the entire post-production period").[10] It then details the circumstances in which pictures can be edited, contingent on the director's involvement. For instance, if Network Broadcast Standards and Practices require edits, the director gets "the first opportunity to make such cuts." ER153 (§ 7-509(b)). And for certain showings, such as domestic in-flight exhibitions and New Media, which includes streaming, the Director is entitled "to edit the English language version of the motion picture at no additional compensation" if "the [studio] edits such motion picture at its own facilities in the United States." ER155 (§ 7-509(g)). Because the DGA Agreement's general ban on editing does not exempt filtering by non-studios like VidAngel, such filtering is impermissible.

VidAngel's textual interpretation is supported by other evidence. First, this reading is consistent with the Directors Guild's own understanding of Section 7-509(g). The guild's summary of rights under the agreement provides: "If the Producer wants to change a motion picture for distribution . . . domestically in New

---

[10] *See* https://www.dga.org/Contracts/Agreements/Basic2014.aspx. The Studios attached only part of Article 7 with their request for judicial notice, but, as they noted, the entire document is available on the guild's website.

Media, . . . [the director] must edit the new version or be consulted about the changes . . . ."[11]

Second, other knowledgeable parties indicated that the Studios understand the DGA Agreement to prohibit filtering by secondary companies. Lionsgate, another studio party to the DGA Agreement, told VidAngel that it could not grant VidAngel a streaming license absent the guild's permission. ER270. And after the Google Play representative told VidAngel that he would have to check contracts to see if VidAngel could stream filtered content through Google Play, he later informed VidAngel that at least one MPAA studio indeed refused the partnership. ER279. Especially at the pleadings stage, these statements justify VidAngel's interpretation.[12]

---

[11] Directors Guild of America, *Summary of Directors' Creative Rights Under the Directors Guild of America Basic Agreement of 2014* § D(5), available at https://www.dga.org/Contracts/Creative-Rights/Summary.aspx. Section D(5) reads in full:

> If the Producer wants to change a motion picture for distribution on videodiscs or videocassettes, basic cable, domestically in New Media, or in-flight, you must be given notice of the amount of time to be added or removed and any change to the aspect ratio, and you must edit the new version or be consulted about the changes in the same manner as you would edit or be consulted in connection with changes for television. (7-509g).

[12] VidAngel can identify the participants and timing of the Lionsgate discussion, but did not do so because of legitimate business considerations—given the Studios' hostility towards filterers, the executive who arranged the meeting asked not to be identified, and VidAngel did not want to burn a friendly bridge unnecessarily. A plaintiff need not marshal its entire case in the complaint. Because VidAngel believed its complaint plausibly alleged conspiracy without identifying that individual, doing so

28

2. The district court's contrary conclusion impermissibly interpreted the DGA Agreement on a motion to dismiss. *See, e.g.*, *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 975 n.2 (9th Cir. 2010) (explaining that claim was not "per se barred by the contract" and noting "that the intent of the parties or properly admitted extrinsic evidence" can be introduced later); *Monsanto*, 465 U.S. at 766 n.11 ("The interpretation of these documents and the testimony surrounding them properly was left to the jury."). To reject VidAngel's allegation at this stage, the text of the DGA Agreement must *unambiguously foreclose* VidAngel's interpretation. *See* ER15. The court, however, badly misread those provisions. It reasoned that because Section 7-509(g) is the only paragraph "that even addresses streaming services" and because it "only applies if the studio 'edits the motion picture at its own facilities in the United States,'" "[i]t is clear that section 7-509 does not prohibit secondary editing." ER15.

The court's analysis is backwards—it uses an exception that permits limited editing for streaming to conclude that other streaming editing is not prohibited. On the contrary, the fact that Section 7-509(g) explicitly provides for streaming editing *by the studios* shows—or at least raises an ambiguity—that editing *by secondary*

---

would cause needless harm. VidAngel understands, however, that it might have to reveal that information in discovery if this Court reinstates its claims.

*companies* like VidAngel is *not* permitted. The court's reading is also illogical. If the studios themselves cannot edit without consulting the director, it would make no sense to give secondary companies free rein to edit.[13]

The court also noted "that the current version of section 7-509 has remained materially unchanged since 1978, which predates the creation of movie filters by decades." ER15. That observation misses the point. Under the DGA Agreement, the Studios have long agreed to generally ban editing motion pictures except in the circumstances provided by that document. None of those circumstances include filtering by secondary companies.

Brushing aside Lionsgate's statement that the directors' permission is required, the court wrote that "there is no indication that [the Studios] share Lionsgate's position with regard to DGA approval." ER16-17. On the contrary, such indications abound—the Studios signed the same DGA Agreement, they have consistently refused to deal with VidAngel and other filtering companies, and they have inserted anti-filtering terms into their licensing agreements with distributors. *Infra* Part I.C. The Studios' conduct is exactly what Lionsgate's statement would predict.

---

[13] VidAngel's concession "that the terms of section 7-509 do not explicitly forbid filtering" (ER15) reflects only that the DGA Agreement does not state in so many words that "filtering by secondary companies is prohibited." But the DGA Agreement accomplishes the same result by broadly forbidding editing then specifying limited circumstances in which some editing is permitted but filtering is not.

The court also objected that Sony and Fleming did not "state[] that the basis of Sony's refusal was the DGA Agreement." ER18. But Rule 8 does not require such specificity. The totality of the allegations and the text of the DGA Agreement make it plausible to infer that if the signatories to the agreement refuse to work with secondary filtering companies, the DGA Agreement supplies the reason.

What's worse, the district court arrived at this conclusion based purely on the pleadings. VidAngel has not had the opportunity even to *ask* the Studios how they view the agreement or seek any discovery regarding the Studios' intent. *Cf. Whittlestone*, 618 F.3d at 975 n.2.

3. Because "[t]he very passage of [the DGA Agreement] establishes that the defendants convened and came to an agreement" to boycott filterers, Section 1's requirement of concerted action is satisfied. *Robertson*, 679 F.3d at 289; *see ibid.* (explaining that the written agreement "constitutes the factual matter establishing a plausible claim of conspiracy"). Reversal is warranted on this ground alone.

### C. Apart From The DGA Agreement, VidAngel Plausibly Alleged Collusion Through Parallel Conduct And Plus Factors

#### 1. VidAngel plausibly alleged parallel conduct in a context that suggests agreement

Apart from and in addition to the DGA Agreement's express agreement to boycott secondary filtering companies, the Studios' parallel refusal to work with filterers and multiple plus factors "nudge[]" VidAngel's claim "from conceivable to

31

plausible." *Twombly*, 550 U.S. at 570. These plus factors must be viewed "in turn and cumulatively." *Musical Instruments*, 798 F.3d at 1194; *see SD3*, 801 F.3d at 424. That is because "[a]ctions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances." *SD3*, 801 F.3d at 425. VidAngel alleged multiple factors that place the Studios' conduct in a context that plausibly suggests agreement: the structure of the industry and facilitating practices; the Studios' actions against self-interest; their motive to conspire; and their insertion of anti-filtering terms into content distributors' licenses. As detailed below, this factual enhancement warrants reversal.

*Market structure and facilitating practices.* Both logic and data show that a "highly concentrated" industry provides a setting for collusion. *Evergreen*, 720 F.3d at 48 (citing *Text Messaging*, 630 F.3d at 627-628); *see, e.g.*, *Sony BMG*, 592 F.3d at 323-324 (noting "'[e]mpirical studies'" that suggest collusion "'is likely to appear when the four leading firms account for some 50 to 80 percent of the market'") (citation omitted). In such an industry, agreement is easier to reach, and defection is easier to detect. *E.g.*, *SD3*, 801 F.3d at 432 ("Fewer 'minds' must 'meet' in a concentrated market."); *Text Messaging*, 630 F.3d at 628 ("a small group" can more easily "detect 'cheating' . . . without having to create elaborate mechanisms"). It is undeniable that the industry here is just such an industry, with six studios—the Studios and three others—so prominent they've earned their own moniker, the "Big

32

Six." *See, e.g.*, Ben Fritz, *Disney Deal for Fox Would End Era of the 'Big Six' Studios*, Wall Street Journal (Dec. 11, 2017). Moreover, in an industry as highly publicized as motion pictures, any deviation from the agreement would quickly be detected.

Practices that facilitate agreement and monitor compliance constitute additional factors suggestive of collusion. Membership in a trade association "provide[s] a basis for notifying alleged members of the conspiracy of the agreed-upon refusal to deal as well as to keep tabs on members." *Evergreen*, 720 F.3d at 49; *see also, e.g.*, *Text Messaging*, 630 F.3d at 628. Here the Studios belong to the MPAA and, further, *"used"* that membership "to adopt and enforce" the agreement, as evidenced by the communications after VidAngel's July/August 2015 letters. *Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015); *see* ER284-285. Even if the DGA Agreement itself is interpreted not to prohibit cooperating with filterers, by signing it each Studio signaled to other studios the general importance of eschewing edits without director participation. *Cf. Interstate Circuit*, 306 U.S. at 226.

The Studios' emails with each other following VidAngel's letters in July/August 2015 likewise suggest agreement, because such communications "provide the means and opportunity to conspire." *SD3*, 801 F.3d at 432; *see also, e.g.*, *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (noting "'a high level of interfirm communications'") (citation omitted); *Evergreen*, 720 F.3d at 49; *Toys*

33

*"R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000). And despite the fact that VidAngel sent its letters separately to each Studio, the Studios immediately conferred with each other, the MPAA, and other MPAA studios, exchanging over 120 emails in August alone. ER285. The inference of concerted action is plausible.[14]

*Actions against self-interest.* Acting against one's "own best interests" also suggests collusion. *Evergreen*, 720 F.3d at 50. For instance, "it [is] suspicious for a manufacturer to deprive itself of a profitable sales outlet." *Toys "R" Us*, 221 F.3d at 935. The Studios have steadfastly refused any arrangement with a secondary filtering company that would yield the benefits of the sizeable market for filtered content.

The Studios cannot deny that this market exists. VidAngel cited authority that estimated the market for filtered movies at 56 million people and indicated that 47% of parents want online filtering services. ER266, 274-275. Moreover, Congress, which rarely acts to benefit a nonexistent constituency, deliberately protected filtering in the FMA, and Google's efforts to partner with VidAngel (before the Studios snuffed out the negotiations) likewise reflects the economic potential.

---

[14] VidAngel knows of these emails only because it received limited discovery to oppose the Studios' preliminary-injunction request on their copyright claims. Yet the Studios maintain that discovery would be pointless.

34

By engaging a filtering company like VidAngel—granting a streaming license, directly selling DVDs, etc.—a studio could profit through both (1) the increased revenue that VidAngel would pay it and (2) greater exposure for its catalog. Many consumers would choose a filterable picture over an unfilterable one, thereby rewarding a studio that partnered with a filtering company over one that does not. *See* ER200-201 (over half of VidAngel's customers would not have watched the movie without filtering). What's more, each Studio has a significant incentive to act first. Being the initial entrant into the filtering market would generate goodwill with consumers and create the potential to lock up that filtering company's technology and customers through contracts. *Cf. Interstate Circuit*, 306 U.S. at 222.

Yet despite these economics, the Studios have uniformly rebuffed VidAngel's efforts. VidAngel received no response to its July 2015 letters seeking "to work with" and "partner with" the Studios. ER284, 308-316. And its August follow-up fared little better—Disney remained silent, and although Fox and Time Warner nominally responded, each failed to participate in scheduled discussions. ER284-285. When VidAngel again contacted them after this litigation began, they likewise refused even to discuss licensing.

Absent an agreement to boycott secondary filtering companies, at least one Studio would have at least attempted to negotiate with VidAngel to exploit the filtering market. Their conduct starkly contrasts with the actions of entities outside this

35

agreement, who recognized the value of secondary filtering companies: Google wanted to work with VidAngel, and a Utah distributor agreed to license content to VidAngel. ER270.

What's more, VidAngel is not the only filtering company the Studios have boycotted. They also refused to grant a license to ClearPlay, despite ClearPlay's best efforts, or to any other filterer during the two decades that secondary companies have attempted to provide effective filtering services. Accordingly, any explanation for the Studios' conduct that is unique to VidAngel rings hollow.

*Motive to conspire.* "'[M]otivation for common action' is a key circumstantial fact." *SD3*, 801 F.3d at 431 (citing Einer R. Elhauge & Damien Geradin, *Global Antitrust Law and Economics* 837 (2007)); *see also, e.g.*, *Interstate Circuit*, 306 U.S. at 222 (noting "strong motive for concerted action"). The Studios face two opposing forces. On one hand, the directors dislike filtering. On the other, consumers' demand for filtering promises increased profits and greater market share. Rather than risk one studio tapping that market for itself, the Studios agreed to boycott filtering companies. This strategy minimized risk by preventing the disruptive consequences of one studio moving first into the filtering market. That possibility is not illusory, because it is far from certain that allowing filtering would spur blowback from the directors—the directors depend on the Studios as much as the Studios depend on the

36

directors, and filtering makes consumers view directors more positively by increasing their enjoyment of the directors' works.[15]

The group boycott, however, maintains the certainty of a comfortable status quo. *See Interstate Circuit*, 306 U.S. at 222 ("There was risk, too, that without agreement diversity of action would follow."); *Toys "R" Us*, 221 F.3d at 932, 936 (affirming conspiracy finding where defendants "were also concerned that any of their rivals who broke ranks and sold to the clubs might gain sales at their expense," and each "was afraid its rivals would cheat and gain a special advantage in that popular new market niche"); *Evergreen*, 720 F.3d at 49 (noting as relevant circumstantial evidence "that the producer defendants were comfortable with the status quo because each of them was dominant in its respective niche"). Indeed, recall that the Studios exhibited this same (mistaken) risk aversion when the VCR was introduced and Redbox appeared. *Supra* at 7-8.

The DGA Agreement reflects these circumstances in two ways. First, it generally forbids editing without the director's involvement. Second, Section 7-509(g)

---

[15] A studio with a larger catalog of non-family-friendly content, like the MPAA studios who declined to join the lawsuit against VidAngel, might be particularly tempted to partner with filterers, because filtering allows it to transform its pictures into ones that can compete with organically family-friendly content. *Contra* ER27 (wrongly concluding that filtered works never compete with unfiltered works).

recognizes the value of streaming services by allowing streaming editing by the Studios themselves (as opposed to a secondary filtering company like VidAngel or ClearPlay) contingent on the director's right to conduct the editing. *Supra* at 26-27.

This case thus resembles *Interstate Circuit*. There a theatre chain dominated first-run movie theatres in several Texas cities but encountered competition with subsequent-run theatres. That chain sent an identical letter to movie distributors stating "two demands as a condition of [the chain's] continued exhibition of the distributors' films in its 'A' or first-run theatres," including that the distributors agree to set a minimum price when selling their movies for subsequent runs. 306 U.S. at 216-217. Each distributor acquiesced. The Supreme Court noted that each distributor knew the others were considering the proposal and had a motive to conspire: "without substantially unanimous action with respect to the restrictions for any given territory there was risk of a substantial loss of the business and good will of the subsequent run and independent exhibitors." *Id.* at 222. The distributors had to wrestle with competing incentives just as the Studios do. Here filtering companies and their customers provide incentives similar to the subsequent-run theatres, and the Studios coped with those incentives like the distributors did. By agreeing to boycott filtering companies, each Studio need not fear one studio gaining an advantage (*e.g.*, business and goodwill) with those companies. Notably, the Supreme Court found the inference of concerted action strengthened by the fact that the distributors did not produce

38

testimony denying agreement. *Id.* at 225. Here, of course, the district court denied VidAngel the opportunity even to ask for such testimony.

At bottom, the Studios' dominance in the industry incentivized them to preserve that status quo and guard against one studio rocking the boat by entering the filtering market. As in *Interstate Circuit*, it is "enough that, knowing that concerted action was contemplated and invited, the [Studios] gave their adherence to the scheme and participated in it." 306 U.S. at 226; *see also Anderson News*, 680 F.3d at 192 ("The presentation of a common economic offer may well lend itself to innocuous, independent, parallel responses; but it does not provide antitrust immunity to respondents who get together and agree that they will boycott the offeror."); *Toys "R" Us*, 221 F.3d at 935-936.[16]

---

[16] *Musical Instruments* is not to the contrary. That case addressed musical instrument manufacturers' implementation of minimum-advertised-price policies that were allegedly coerced by a major instrument retailer. 798 F.3d at 1189-1190. Addressing plaintiffs' allegation that the manufacturers acted against self-interest, the Court determined that this did not suggest collusion because the manufacturers simply "heed[ed] similar demands made by a common, important customer." *Id.* at 1195. But that case is distinguishable on a number of grounds: plaintiffs had conducted some discovery, *id.* at 1190-1191 & n.2; the Studios' bargaining position vis-à-vis the directors is stronger than the manufacturers vis-à-vis the retailer, because the directors need the Studios, who dominate the industry, whereas there was nothing special about the instrument manufacturers; a price floor can be changed more easily (as this Court explained), making it more likely that a single entity can unilaterally risk a price move, whereas cooperating with filtering companies would likely require a multi-year contract; and, although companies may independently decide to respond similarly to similar demands, they cannot agree with each other to implement those

*Vertical agreements as evidence of horizontal collusion.* The Studios' efforts to prevent their downstream licensees like Google from working with VidAngel also suggest collusion, for "it is well established that vertical agreements, lawful in the abstract, can in context 'be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel.'" *United States v. Apple, Inc.*, 791 F.3d 290, 319-320 (2d Cir. 2015) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007)). VidAngel's once-promising negotiations with Google Play ended after Fleming learned that at least one MPAA studio would not permit Google to work with VidAngel. ER279. And the Studios similarly caused YouTube and Chromecast to withdraw support for VidAngel's filtering technology. ER277.

VidAngel plausibly alleges the Studios' pressure provoked these changes. That belief is supported not only by Fleming's comments regarding Google Play, but also by a distribution agreement between Sony and Google that VidAngel believes mirrors the Studios' distribution agreements with Google. This agreement forbids Google to "make, or authorize any others to make, any modifications, deletions, cuts, alterations or additions in or to any Included Program without [Sony's] prior written consent." ER271-272. That plainly outlaws filtering.

\* \* \*

---

similar responses, yet that is precisely what the Studios have done here, *cf. Interstate Circuit*, 306 U.S. at 226.

In sum, viewing the plus factors cumulatively as the Court must, VidAngel's complaint plausibly alleges agreement. The Studios communicate with each other in an industry susceptible to collusion, they have declined to avail themselves of a profitable market, and they have good reason to conspire to avoid that market. "[E]ven if it strikes a savvy judge that actual proof of those facts is improbable," VidAngel's "well-pleaded complaint" entitles it to ask the Studios for evidence justifying their denials. *Twombly*, 550 U.S. at 556.

### 2. The district court misunderstood the controlling legal standard and impermissibly chose between competing inferences from the complaint

a. The district court's rejection of VidAngel's detailed allegations rested on its fundamental misunderstanding of the proper standard for stating a claim under Rule 8. Instead of simply asking whether VidAngel's claim was plausible, the court repeatedly searched for a "legitimate business reason" that could justify the Studios' conduct, then used that plausible, innocent explanation to reject VidAngel's claim. *E.g.*, ER16 (rejecting VidAngel's contention that "the Court cannot choose between competing inferences at this stage of the proceedings" and finding the Studios' explanation "plausible"). The thrust of the court's reasoning was that collusion was implausible because each Studio's actions could be explained by their independent reactions to the directors' dislike of filtering. According to the court, the Studios must have independently decided to require DGA approval because "directors have

41

historically been hostile to any alterations" (ER16; *see* ER18), and the Studios could have refused to sell DVDs to VidAngel because the "directors oppose filtering" (ER20). *See also* ER16 (concluding that Lionsgate must have independently decided to require the guild's agreement).

But "[t]he question at the pleading stage is not whether there is a plausible *alternative* to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Evergreen*, 720 F.3d at 45 (quoting *Anderson News*, 680 F.3d at 189) (emphasis in original). "Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." *Watson*, 648 F.3d at 458; *see, e.g.*, *SD3*, 801 F.3d at 425 ("[I]t is not our task at the motion-to-dismiss stage to determine 'whether a lawful alternative explanation appear[s] more likely' from the facts of the complaint.") (citation omitted). Yet that is precisely what the district court did—because the directors' preferences *could* supply an innocent explanation for the Studios' conduct, the court held that VidAngel's allegations necessarily fail.

The court's holding mangles the controlling standard. It effectively required VidAngel to show that the Studios' conduct *probably*, rather than *plausibly*, resulted from agreement, and meant that VidAngel had to *exclude* the Studios' proffered justification. "When a court confuses probability and plausibility, it inevitably begins

42

weighing the competing inferences that can be drawn from the complaint." *SD3*, 801 F.3d at 425; *see, e.g.*, *Anderson News*, 680 F.3d at 184 ("Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible."); *id.* at 185 ("A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible."). That is simply not what Rule 8 and *Twombly* require. Whether the pull of the directors is stronger than the pull of the filtering market is a factual question that cannot be answered at this stage. *Cf. Gelboim*, 823 F.3d at 782 ("The Banks argue that the 'pack' behavior described in the complaints is equally consistent with parallelism. Maybe; but at the motion-to-dismiss stage, appellants must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation.") (emphasis in original).

Indeed, under the district court's view, Rule 8's requirements are no different than those of Rule 56 or stricter pleading standards specifically mandated by other laws. It is at summary judgment that "a plaintiff must summon 'evidence tending to exclude the possibility of independent action.'" *SD3*, 801 F.3d at 425 (quoting *Twombly*, 550 U.S. at 554); *Anderson News*, 680 F.3d at 184 ("to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of

independent action"); *Starr*, 592 F.3d at 325 (quoting Areeda & Hovenkamp). Likewise, under the heightened pleading standard of the Private Securities Litigation Reform Act of 1995, the court "must engage in a comparative evaluation" between the "inferences urged by the plaintiff" and the "competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Under the PSLRA, therefore, "[i]t does not suffice that a reasonable factfinder plausibly could infer" liability. *Ibid.* Yet the district court effectively imposed that same stringent requirement despite the absence of any similar command in Rule 8 or *Twombly*.

The court wrote that *Kendall* supported its analysis: "'Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws.'" ER16 (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008)). But the plaintiffs there had been allowed to conduct discovery, so that decision is readily distinguishable. 518 F.3d at 1046. In any event, in context that statement is much narrower than the district court thought. The *Kendall* allegations did not even suggest a conspiracy on their face. The plaintiffs complained that defendants established a price floor for certain fees related to credit-card transactions. But as the Court explained, that floor was necessary just "to make a profit"

44

under that market's dynamics. *Id.* at 1049. Each defendant thus had little choice but to set that price.

Any broader reading of *Kendall* is not only untenable on the opinion's own terms, but would conflict with decisions of multiple other circuits and the Supreme Court. Indeed, the district court in *Evergreen* adopted an identically broad understanding of *Twombly*, finding that "'there are legitimate business reasons that can *as easily* explain defendants' refusal to deal with Evergreen or to compete with one another for market share *as can* any insinuation of a conspiratorial agreement.'" *Evergreen*, 720 F.3d at 42 (emphases in original). The First Circuit roundly rejected that holding. This Court should do the same.

b. Although the district court's misunderstanding of the proper legal standard surfaced most often when discussing the directors' preferences, the court made similar mistakes throughout its discussion of VidAngel's plus factors.

*First*, regarding VidAngel's allegations that the Studios rebuffed VidAngel's efforts to partner with them, the court again impermissibly drew adverse inferences against VidAngel and reached judgments about motives and economics inappropriate for a motion to dismiss. The court concluded that the Studios "could reasonably contend that the sale of DVDs to VidAngel might ultimately be detrimental to their economic interests." ER20. But whether the Studios would have been better off part-

45

nering with VidAngel or boycotting it is an economic question better suited to economic-forecasting experts than a judge, and whether the Studios *believed* they would profit more under one scenario or the other is a plainly factual question. *See SD3*, 801 F.3d at 426 (faulting the district court for "finding that motive was 'nonexistent'" when that allegation was "plainly contradicted by the terms of the complaint"); *Quality Auto*, 870 F.3d at 1275 (chiding the dissent for relying on "external knowledge" of the industry).[17]

Addressing VidAngel's post-litigation overtures regarding streaming licenses (*supra* at 10, 35), the court again picked the Studios' inference over VidAngel's: "[The Studios'] refusal to engage in joint licensing discussions with a company that they allege is operating an infringing service is a rational business decision and does not support a plausible inference of an agreement to eliminate filtering." ER19. But VidAngel alleges that the excuse of litigation is mere pretext, and that is particularly plausible given the Studios' similar conduct *pre*-litigation and their consistent refusal to deal with all secondary filtering companies, not just VidAngel. *See Watson*

---

[17] The court also wrote that VidAngel "concedes that [the Studios] have rational economic motives not to deal with VidAngel," because VidAngel alleged that they "'do not receive a profit from each instance a title is re-sold and streamed' on VidAngel's website." ER20 (quoting ER286). The court misread the countercomplaint—VidAngel's point, spelled out in the same paragraph (ER286), is that the Studios *could* receive a profit by working with VidAngel. Indeed, partnering with VidAngel increases viewership and DVD sales because many of VidAngel's customers would not have bought the unfiltered picture at all. ER286. No cannibalization occurs.

*Carpet*, 648 F.3d at 458 (rejecting the district court's similar conclusion because "the plausibility of [plaintiff's] litigiousness as a reason for the refusals to sell carpet does not render all other reasons implausible"). The court cannot simply disbelieve that allegation at the pleadings stage.

*Second*, the court continued to draw its own inferences and factual conclusions when dismissing VidAngel's reliance on the Studios' injection of anti-filtering terms into its vertical agreements. As to forcing YouTube and Chromecast to withdraw support for VidAngel, the court doubted that the Studios "were aware of [VidAngel's] service prior to VidAngel's letter to" each Studio in July 2015. ER21. It is unclear how the court expected VidAngel to ascertain the Studios' knowledge before discovery. Regardless, the court misunderstood the conspiracy's scope: VidAngel does not allege that the Studios banded together to boycott VidAngel alone; rather, they agreed to boycott all secondary filtering companies. The Studios didn't need to know VidAngel's name to pressure Chromecast and YouTube administrators to remove filtering-friendly technology.

The court also speculated that the Studios could not have triggered the Chromecast and YouTube changes because Google Play, through Mark Fleming, wanted to partner with VidAngel after those changes occurred; according to the court, had the Studios truly pressured Chromecast and YouTube to snub filtering companies, then Google Play would not have pursued VidAngel. But that reasoning

47

ignores that Google Play is a different division of Google, and it's easy to think that the message had not reached Fleming. After all, the message *did* eventually reach him once the negotiations progressed enough to require him to determine "if there's any language in our current contracts that may block this." ER17 (quoting Fleming). Fleming later told VidAngel's CEO that at least one MPAA studio would not allow Google to partner with VidAngel. ER279.

The court went even further, however, to brush aside Fleming's statement, finding it insufficiently detailed to be believed: "There is no allegation that any other MPAA studios were present, nor is there any indication which of the studios, if any, communicated with Fleming." ER18. But the court must take as true Fleming's March 2015 report that at least one MPAA studio will not permit Google to work with VidAngel. It doesn't matter whether the defendant Studios were present—a fellow MPAA studio (Sony) admitted that its co-conspirators refuse to deal with secondary filtering companies. Google Play and VidAngel had been working toward a partnership, but the negotiations stopped once Fleming met with an MPAA studio. The inference is obvious, and it favors VidAngel. No further detail is needed to make that allegation "plausible" (ER18), particularly against the backdrop of all VidAngel's other circumstantial and direct evidence indicating that the MPAA studios have

48

agreed to boycott filterers. Without any ability to force Fleming to reveal more details and without the opportunity to propound even an interrogatory to the Studios, VidAngel's report of Fleming's statement suffices under Rule 8.

To support the court's holding, it again misread *Kendall*: "'To allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin.'" ER18 (quoting *Kendall*, 518 F.3d at 1047). But VidAngel's allegations leave no doubt about how the Studios could investigate this allegation—the meeting was in March 2015, with Mark Fleming and Sony, to discuss VidAngel.

Moreover, details "*such as*" "time, place, or person" are needed only to allege an express agreement, not to use parallel conduct and plus factors. *See, e.g.*, *Sony BMG*, 592 F.3d at 325 ("In this case, as in *Twombly*, the claim of agreement rests on the parallel conduct described in the complaint. Therefore, plaintiffs were not required to mention a specific time, place or person involved in each conspiracy allegation.").[18] The very next sentence of *Kendall* explains why: "A bare allegation of a conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contracts and

---

[18] And as to express agreement, the DGA Agreement obviates the need for further detail. *E.g.*, *Robertson*, 679 F.3d at 289-290; *supra* Part I.A, I.B.

agreements daily." 518 F.3d at 1047. VidAngel's allegations easily contain enough detail to supply "an idea of where to begin." *Ibid.* No more is required.

Even if the court correctly interpreted what allegations *Kendall* generally mandated, *Kendall* is also distinguishable because the district court there permitted the plaintiffs to depose the defendants. 518 F.3d at 1046. Although it is true that *Kendall* did not expressly "state that [discovery] is required" (ER18), the decision cannot be read without that context. *See* 518 F.3d at 1048.

In the district court's erroneous view, VidAngel needed somehow to already acquire the very evidence that discovery is meant to reveal. But this is a motion to dismiss. VidAngel has "conducted no discovery. Discovery may reveal the smoking gun or bring to light additional circumstantial evidence that further tilts the balance in favor of liability." *Text Messaging*, 630 F.3d at 629. "[A]t this early stage in the litigation," the complaint need only "provide[] a sufficiently plausible case of" conspiracy. *Ibid.* VidAngel's complaint did so, and reversal is warranted.

## II. VIDANGEL STATED A VERTICAL RESTRAINT OF TRADE BY PLAUSIBLY ALLEGING MARKET POWER

In addition to the Studios' unlawful horizontal agreement to boycott secondary filtering companies, VidAngel adequately alleged that each Studio violated Section 1 of the Sherman Act by inducing its downstream content distributors to refuse to deal with filterers. *E.g.*, ER288-290; *cf. Redbox Automated Retail LLC v. Universal City Studios LLP*, No. 08-766(RBK), 2009 WL 2588748, at *5 (D. Del. Aug. 17,

50

2009) (holding that Redbox "sufficiently pleaded that Universal has induced or otherwise convinced [distributors] to boycott" it). To state a valid vertical conspiracy of this type, "a plaintiff must allege that the defendant has market power within a 'relevant market.'" *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008). "Market power is the power 'to force a purchaser to do something that he would not do in a competitive market,'" and represents "'the ability of a single seller to raise price and restrict output.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) (citation omitted). The district court held that VidAngel's vertical-restraint claim failed because VidAngel failed to allege market power as a matter of law. As with the horizontal conspiracy, the court applied too strict a standard at the pleadings stage.

"Market power may be demonstrated through either of two types of proof": "direct evidence of the injurious exercise of market power" or "circumstantial evidence pertaining to the structure of the market." *Rebel Oil*, 51 F.3d at 1434; *see, e.g.*, *Toys "R" Us*, 221 F.3d at 937. For the latter, the plaintiff typically defines a market and relies on the defendant's market share and the market's structure (*e.g.*, the existence of barriers to entry). *Rebel Oil*, 51 F.3d at 1434. The complaint need not plead these elements "with specificity." *Newcal*, 513 F.3d at 1045. And critically for

51

our purposes, it is well-recognized that "the existence or non-existence of that market power is a factual question." *Id.* at 1052. VidAngel adequately pleaded market power both ways.

A. The injurious exercise of the Studios' market power is plain from how effectively they have frustrated the filtering industry's development. The Studios stymied VidAngel's ability to work with YouTube, Chromecast, and Google Play, and no other secondary filtering company has succeeded where VidAngel failed. Of the multiple other companies that have tried to survive, only ClearPlay barely clings to life. Online filtering of movies and television shows has significantly declined due to each Studio's anticompetitive actions. ER289-290; *see, e.g.*, *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003) (finding market power where the defendants "effectively preclud[ed] their largest competitor from successfully soliciting" customers); *Toys "R" Us*, 221 F.3d at 937 (affirming finding of market power where "it was clear that [the] boycott was having an effect in the market").

The district court did not address this direct evidence in terms of showing market power. Because these allegations suffice to defeat the motion to dismiss without examining market share, the court's judgment should be reversed.

B. VidAngel also adequately pleaded circumstantial evidence of market power. VidAngel stated that the Studios' gross revenue in the overall motion-picture industry are: Fox at 14.1%, Warner Bros. at 16.5%, and Disney at 26.2%. ER288.

And VidAngel included additional allegations about the television industry: Warner Bros. is the largest television production company measured by revenue and library, Disney owns such popular channels as ESPN and the Disney Channel, and Fox owns Fox News, FX, and Fox Sports. ER288-289. What's more, VidAngel permissibly argued that the relevant movie market is even narrower, limited to high-grossing films, which obviously are higher in demand and thus more critical to a filtering company's viability. *See Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986) ("industry anticipated top-grossing films constitute a distinct product market"); *Visa*, 344 F.3d at 240 (noting relevance of "customer preference"). Likewise, some of those channels are so popular that content distributors cannot risk defying their owners. VidAngel further alleged that capital and talent requirements raise entry barriers. ER289.

The district court conjured a bright-line rule out of thin air. It concluded that the enumerated "market shares are insufficient as a matter of law to confer market power." ER22-23. That holding lacks support in the case law. Far from it, "the existence or non-existence of that market power is a factual question," and "[r]esolution of the market power question on a Rule 12(b)(6) motion is therefore inappropriate in this case." *Newcal*, 513 F.3d at 1052. This Court has long been "reluctant to apply such bright-line rules regarding market share in deciding whether a defendant has market power." *Rebel Oil*, 51 F.3d at 1438 n.10. The reason is that the relevant

factors—market definition (which depends on economic substitutes and consumer preferences), entry barriers, etc.—are highly fact-intensive questions unconducive to decision on the pleadings. *E.g.*, *Eastman Kodak*, 504 U.S. at 466-467 (explaining that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law" and requiring instead a "close[]" examination of "the economic reality of the market at issue"). For instance, Disney's control of popular properties like Star Wars and Fox's ownership of X-Men movies might pressure licensees to accept anti-filtering terms so they can distribute those series to their rabid fans.

The district court thought that *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), supported its decision, but that is incorrect. The Supreme Court indicated that a 30% "market share *alone* was insufficient as a basis to *infer* market power." 466 U.S. at 27 (emphases added). The Court therefore rejected any "basis for applying the per se rule against tying." *Id.* at 28. A market share of 30% thus might represent a threshold to establish market power through market share alone, but it is not a floor below which market-power allegations fail to state a claim. *Cf., e.g., Visa*, 344 F.3d at 240 (26% "of a highly concentrated market" (bench trial)).

54

VidAngel's allegations of market share in the overall motion-picture industry, combined with its other allegations about structure and actual effects, suffice to defeat a motion to dismiss.[19]

C. Finally, everyone agrees that if VidAngel plausibly alleged collusion, then each Studio's market share is aggregated to indisputably create market power. *See* ER23, 237-238. So if the Court reverses on the horizontal claim, the vertical claim survives, too.

## III.  VIDANGEL PLAUSIBLY ALLEGED A VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

"The UCL is a broad remedial statute that permits an individual to challenge wrongful business conduct 'in whatever context such activity might occur.'" *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (citation omitted). Its terms prohibit "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Because the statute is written in the disjunctive," "[e]ach prong of the UCL is a separate and distinct theory of liability." *Lozano*, 504 F.3d at 731. VidAngel alleged that the Studios' conduct was both "unlawful" and "unfair" under the UCL.

---

[19] Disney recently announced an acquisition of Fox (though it excludes some Fox channels). Brooks Barnes, *Disney Makes $52.4 Billion Deal for 21st Century Fox in Big Bet on Streaming*, N.Y. Times (Dec. 14, 2017), https://www.ny-times.com/2017/12/14/business/dealbook/disney-fox-deal.html. That would create market power even under the court's bright-line rule.

A. Conduct is "unlawful" if it violates another federal or state law. *E.g.*, *Davis v. HSBC Bank Nev., NA*, 691 F.3d 1152, 1168 (9th Cir. 2012). Accordingly, if VidAngel adequately stated an antitrust claim, then it necessarily stated a UCL "unlawful" claim. *Cf.* ER25.

B. Conduct is "unfair" if it "'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Davis*, 691 F.3d at 1169 (citation omitted). This approach uses a balancing test to "weigh 'the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" *Ibid.*[20]

VidAngel's allegations satisfy that test. The Studios' refusal to deal with secondary filtering companies has substantially injured consumers' ability to access filtered movies and shows. Each Studio has even prevented other entities like Google from dealing with filterers regardless of their own business preferences. What's more, this is all in the face of a declared FMA policy to "authorize[] the creation or

---

[20] Under another test, a practice also is unfair if it "'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" *Id.* at 1170 (citation omitted). The California Supreme Court has held that this test is the only one appropriate for "unfair" claims by a defendant's competitor; for non-competitors, however, courts have used either this test *or* the balancing test described above (or both). *Id.* at 1169-1170. As VidAngel does not compete with the Studios to create content, it also invokes the balancing test. *See Lozano*, 504 F.3d at 736.

56

distribution of any technology that enables the filtering" of content "by or at the direction of a member of a private household." *Disney*, 869 F.3d at 857. The Studios, however, have impeded that distribution.

VidAngel's UCL claim is particularly viable as an analog to its vertical-restraint claim. Even if a 30% market-share threshold existed to sustain a motion to dismiss under the Sherman Act, no such bright-line rule exists under the UCL—nor should it given the UCL's broad remedial purpose. The UCL thus furnishes a stop-gap for consumers left unprotected by a strict interpretation of the federal antitrust laws.

The district court held that if VidAngel's antitrust claims fail, then its UCL "unfair" claim necessary fails. ER25 (citing cases). Not so. First, that reasoning ignores the undisputed distinction between the "unfair" and "unlawful" prongs. Second, it misconstrues the line of cases that purportedly support the court's holding. Those cases derive from *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (2001), but there the conduct did not simply escape the Sherman Act; it was affirmatively "*condoned* under the antitrust laws" under the principle of *United States v. Colgate & Co.*, 250 U.S. 300 (1919). *Chavez*, 93 Cal. App. 4th at 375 (emphasis added); *cf. City of San Jose v. Office of Comm'r of Baseball*, 776 F.3d 686, 691-692 (9th Cir. 2015) (following *Chavez* given "baseball's singular and historic exemption from the

antitrust laws"). VidAngel's "unfair" UCL claim therefore survives even if its antitrust claims fail.

## IV. VIDANGEL STATED A CLAIM FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

As a secondary claim to its antitrust claims, VidAngel alleged intentional interference with prospective economic relations, which requires "'(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.'" *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007) (citation omitted). The plaintiff must also "allege an act that is wrongful independent of the interference itself." *Ibid.* This claim thus depends on the reinstatement of VidAngel's antitrust or UCL claims.

The district court also concluded that VidAngel failed the first element, holding that no future economic benefits were "reasonably probable." ER24. That requirement "'protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will arise.'" *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1164 (2003) (citation omitted). VidAngel's relationships with Google

58

Play and YouTube, and the benefits therefrom, are far from "speculative." VidAngel's service was actively reaping benefits from YouTube until the Studios' anti-competitive conduct made YouTube withdraw support. And negotiations with Google Play had progressed for months until they abruptly ceased—at the same time Google Play was told that the MPAA studios would refuse the partnership. Those allegations suffice to state a claim pending discovery. *See, e.g.*, *Roybal v. Equifax*, No. 2:05-cv-01207-MCE-KJM, 2008 WL 4532447, at *14 (E.D. Cal. Oct. 9, 2008).

The district court did not explicitly address YouTube, and regarding Google Play it declared "that VidAngel only engaged in preliminary discussions." ER23. That constitutes a factual finding impermissible at this stage.

The court's other objections—essentially that the Studios did not pressure Google Play and committed no misconduct (ER24)—are derivative of the court's conclusions on the antitrust claims, and should be rejected for the same reasons.

## V. AT THE VERY LEAST, VIDANGEL SHOULD HAVE BEEN GRANTED LEAVE TO AMEND

This Court has repeatedly instructed that "leave to amend 'should be granted with extreme liberality.'" *Petersen v. Boeing Co.*, 715 F.3d 276, 281 (9th Cir. 2013) (citation omitted); *see, e.g.*, *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "Dismissal of a complaint without leave to amend is only proper when, upon de novo review, it is clear that the complaint could not be saved

by any amendment." *Ariz. Students' Ass'n v. Ariz Bd. of Regents*, 824 F.3d 858, 871 (9th Cir. 2016).

The court neglected to explain why it thought VidAngel could not "identify additional facts to support its claims." ER28. That ruling is particularly curious when contrasted with the portions of the order (incorrectly) faulting VidAngel for supplying insufficient detail. *See* ER18, 20, 22. Insufficient detail is precisely the type of defect that an amended complaint can cure. If necessary, VidAngel can provide more detail regarding, for instance, the statements from Lionsgate, the negotiations with Google Play, and data and other information regarding the Studios' market power in various sub-markets. The court wholly failed to articulate why such information could not cure whatever factual shortcomings the complaint might have.[21]

## CONCLUSION

The judgment of the district should be reversed, and the case should be remanded for further proceedings.

## STATEMENT OF RELATED CASES

VidAngel is not aware of any related cases pending before this Court.

---

[21] As explained *supra* n.12, VidAngel need not divulge various details of its case to satisfy Rule 8, particularly given the costs of revealing that information in an industry bent on thwarting cooperation with filterers. That said, should VidAngel have to choose between losing its claims and taking that risk, VidAngel will do what is necessary.

60

Respectfully submitted.

David W. Quinto
VIDANGEL, INC.
3007 Franklin Canyon Drive
Beverly Hills, CA 90210
Tel: (213) 604-1777
Fax: (213) 604-1777
*dquinto@vidangel.com*

Ryan Geoffrey Baker
Jaime Wayne Marquart
Scott M. Malzahn
BAKER MARQUART LLP
2029 Century Park East, 16th Floor
Los Angeles, CA 90067
Tel: (424) 652-7800
Fax: (424) 652-7850
*rbaker@bakermarquart.com*

/s/ *Douglas D. Geyser*
Peter K. Stris
Douglas D. Geyser
Catherine Hegdale
STRIS & MAHER LLP
725 S. Figueroa Street, Suite 1830
Los Angeles, CA 90017
Tel.: (213) 995-6806
Fax: (210) 978-5430
*douglas.geyser@strismaher.com*

*Counsel for Appellant*

February 12, 2018

61

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,984 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ *Douglas D. Geyser*
Douglas D. Geyser
STRIS & MAHER LLP
725 S. Figueroa Street, Suite 1830
Los Angeles, CA  90017
Tel.:  (213) 995-6806
Fax:  (210) 978-5430
*douglas.geyser@strismaher.com*

*Counsel for Appellant*

February 12, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2018, an electronic copy of the foregoing Opening Brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Ninth Circuit, using the appellate CM/ECF system. I further certify that all parties in the case are represented by lead counsel who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Douglas D. Geyser*
Douglas D. Geyser
STRIS & MAHER LLP
725 S. Figueroa Street, Suite 1830
Los Angeles, CA  90017
Tel.:  (213) 995-6806
Fax:  (210) 978-5430
*douglas.geyser@strismaher.com*

February 12, 2018